UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| RACHEL WILLARD, | § § | |
| Plaintiff. | § § § | |
| VS. | § § | CIVIL ACTION NO. 3:18–CV–00233 |
| FRIENDSWOOD ISD, | § § § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before me is Friendswood Independent School District's Motion for Summary Judgment ("Motion for Summary Judgment"). *See* Dkt. 29. After reviewing the summary judgment briefing, analyzing the relevant case law, and hearing oral argument, I recommend that the Motion for Summary Judgment be **GRANTED**.

## FACTUAL BACKGROUND

Plaintiff Rachel Willard ("Willard") began working for Defendant Friendswood Independent School District ("FISD") in 2014 as a first-grade teacher at Westwood Elementary School. In early January 2016, Willard requested and took leave under the Family and Medical Leave Act after her 14-year old son committed suicide.

On March 21, 2016, Willard returned to work. She was eager to be back in the classroom because working with the kids helped her deal with her intense grief. Upon returning from leave, Willard maintains that she did her "job well and received no complaints." Dkt. 32-2 at 1. A fellow teacher, however, observed Willard "struggling with

1

maintaining her job duties in the classroom and providing students with the requisite attention and instruction necessary for their success." Dkt. 29-1 at 90. The same teacher reported that "[a]fter her son's suicide, Ms. Willard often times appeared emotionally distraught and disconnected from the classroom environment." *Id.*

On May 2, 2016, Westwood Elementary School Principal Kristin Moffitt ("Principal Moffitt") and FISD Superintendent Trish Hanks ("Superintendent Hanks") requested a meeting with Willard to discuss her work performance. At the meeting, Principal Moffit and Superintendent Hanks expressed their concern that Willard "needed more time to heal" and that she had received "too much assistance from other teachers." Dkt. 32-2 at 2. Concerned about Willard's ability to effectively perform her role as a first-grade teacher, Superintendent Hanks offered Willard a position as a paraprofessional for the next school year. It was an at-will job that did not require Willard to sign a written contract. According to Superintendent Hanks,

> [By accepting the paraprofessional position,] Ms. Willard could continue working with students and remain at Westwood Elementary where she was comfortable. I further explained to Ms. Willard that she would need to resign from her teaching contract; otherwise, I would have to recommend to the FISD board of trustees that it take action to terminate Ms. Willard's contract to prevent it from automatically renewing for the following year pursuant to state law. Ms. Willard did not voice any opposition to this plan.

Dkt. 29-1 at 82.

The following day, on May 3, 2016, Willard went to FISD's central office and met with Assistant Superintendent Thad Rohr ("Assistant Superintendent Rohr"). Willard inquired about signing a teaching contract for the following school year. This came as quite a surprise to Assistant Superintendent Rohr because Superintendent Hanks had

informed him the day before that Willard would be resigning from her teaching post and accepting the paraprofessional position. Willard explained to Assistant Superintendent Rohr that she was not resigning from her current position because she wanted to continue teaching. Assistant Superintendent Rohr told Willard that if she did not resign from her teaching job and accept the paraprofessional position by May 4, 2019, her teaching contract would be recommended for termination, possibly leaving her without employment at Westwood Elementary School.

On May 4, 2016, Principal Moffitt arranged a meeting between Willard, Assistant Superintendent Rohr, and herself at the Westwood Elementary School campus to discuss whether Willard intended to submit her resignation. Prior to the scheduled meeting, Willard approached Principal Moffitt in the hallway and stated that she was not signing anything suggesting that she could not perform her duties. As a result of this encounter, Assistant Superintendent Rohr decided to meet alone with Willard in her classroom after school ended. In those discussions, Assistant Superintendent Rohr asked Willard if she was going to resign her contract and take the paraprofessional position. When Willard said she was not resigning, Assistant Superintendent Rohr informed her that Superintendent Hanks would have to recommend her termination to the FISD Board of Trustees.

Superintendent Hanks did recommend the termination of Willard's teaching contract to the FISD Board of Trustees. At its May 9, 2019 meeting, the FISD Board of Trustees considered the recommendation but tabled any action to terminate Willard's employment contract. After that FISD Board of Trustees meeting, Superintendent Hanks and Principal Moffitt decided to renew Willard's teaching contract and re-assign her to co-

3

teach in a Pre-K inclusion program for the 2016–2017 school year. To this end, FISD administrators sent Willard an employment contract for 2016–2017. That employment contract required Willard to sign and return the contract by May 24, 2016 or she would "be deemed to have resigned . . . at the end of [her] existing contract term." Dkt. 29-2 at 36. Willard never signed and returned the contract. Nonetheless, on June 13, 2016, the FISD Board of Trustees went ahead and voted to renew Willard's employment contract. On July 8, 2016, Willard submitted a written resignation, stating: "[T]o the extent that anyone thinks I do have [a valid] contract [with FISD], I am giving my notice of resignation." Dkt. 29-1 at 79.

Willard filed this lawsuit against FISD for retaliation, discrimination, and a hostile work environment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* I dismissed the retaliation claim at the Rule 12(b)(6) stage for failure to state a claim. *See Willard v. Friendswood Indep. Sch. Dist.*, No. 3:18–CV–00233, 2019 WL 2906294 (S.D. Tex. June 11, 2019). FISD has now moved for summary judgment on the remaining hostile work environment and discrimination claims.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's claim. Put another way, "[s]ummary judgment is proper when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *Coleman v. United States*, 912 F.3d 824, 828 (5th Cir. 2019). A fact issue is material "only if its

resolution could affect the outcome of the action." *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 877 (5th Cir. 2003) (quotation marks and citation omitted). When deciding whether a fact issue exists, this court reviews the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. *See Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008).

## ANALYSIS

**A.    ADA HOSTILE WORK ENVIRONMENT**

To establish a hostile work environment claim under the ADA, a plaintiff must show:

> (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on her disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

*Patton v. Jacobs Eng'g Grp., Inc.*, 874 F.3d 437, 445 (5th Cir. 2017) (citation omitted). To be actionable, the harassment must "be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment." *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998) (quotation marks and citation omitted). The alleged conduct must be both "objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so." *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005). In addressing a hostile work environment claim, I must examine the totality of circumstances, including "the frequency of the discriminatory conduct, its

severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999).

Willard contends that she was subject to a hostile work environment because: (1) Principal Moffit and Superintendent Hanks "blind-sided" her by asking her to resign; (2) Superintendent Hanks, Principal Moffitt, and Assistant Superintendent Rohr intimidated her when they "blocked" a door she used to walk her class outside to recess; (3) Assistant Superintendent Rohr verbally threatened her to resign; and (4) two members of the FISD Board of Trustees talked about her mental health.

Regarding frequency, the alleged hostile treatment at issue only spanned nine days, from May 2, 2016 (when Superintendent Hanks and Principal Moffitt met with Willard to discuss their concerns), through May 11, 2016 (when Principal Moffitt informed Willard that she had been assigned to co-teach a Pre-K inclusion class for the next school year).

The alleged conduct at issue neither rises to the level of severity required to create a hostile work environment, nor is the type of conduct that courts have found to constitute harassment. *See Credeur v. La., Through Office of Atty. Gen.*, 860 F.3d 785, 796 (5th Cir. 2017); *McConathy*, 131 F.3d at 563. This is not surprising since the bar to establish a hostile work environment claim in the Fifth Circuit is "high." *Gowesky v. Signing River Hosp. Sys.*, 321 F.3d 503, 509 (5th Cir. 2003).

In *Credeur*, the plaintiff claimed she encountered a hostile work environment as a result of being (1) ordered to attend a meeting; (2) required to work at least 3–4 hours in the office and not to work at home; (3) criticized for her work performance; (4) threatened

6

by her employer that she would be terminated; (5) asked to sign false payroll documentation; and (6) forced to take leave without pay. *See* 860 F.3d at 796. The Fifth Circuit held that the plaintiffs experience did "not convert her employer's actions into harassment sufficient to create a hostile work environment." *Id.* at 797. "[T]his conduct is not the type that courts have found to constitute harassment, and certainly not harassment that is sufficient, severe, or pervasive to create a hostile work environment." *Id.* at 796.

In *McConathy*, the plaintiff alleged that her supervisor (1) was unsupportive when she needed several surgeries, (2) became angry and said she had "better get well this time," (3) told plaintiff he would no longer tolerate her health issues, (4) complained about the plaintiff's extensive use of company benefits, (5) pressured plaintiff to return to work before she recovered, (6) transferred assignments away from plaintiff, and (7) refused to acknowledge plaintiff's presence. *See* 131 F.3d at 560–61. In affirming summary judgment in favor of the employer, the Fifth Circuit held that the employer's conduct was not severe or pervasive enough to create a hostile work environment. *See id.* at 563–64.

If the conduct as alleged in *Credeur* and *McConathy* did not give rise to a hostile work environment claim, FISD's actions in this case certainly do not meet this stringent test.[1] When the record demonstrates a legitimate concern regarding an employee's performance, as is the case here, "[c]riticism . . . and even threats of termination do not

---

[1] Apparently recognizing this inescapable conclusion, Willard does not even bother to respond to FISD's summary judgment argument other than to cryptically claim in a footnote that FISD "merges their [sic] constructive discharge argument with [Willard's] hostile work environment claim." Dkt. 32 at 15 n.4. This statement is without merit, as FISD methodically (and separately) describes in great detail in its briefing why the ADA hostile work environment and discrimination claims should not survive summary judgment.

satisfy the standard for a harassment claim." *Credeur*, 860 F.3d at 796. Willard must concede that she was never prevented from doing her job, suspended, or formally disciplined. Thus, even if everything Willard claims is true, FISD's actions are insufficient as a matter of law to establish a hostile work environment claim. *See, e.g., Soledad v. United States Dep't of Treasury*, 304 F.3d 500, 506 (5th Cir. 2002) (finding that employer's prevention of plaintiff from attending therapy sessions and its derogatory comments about plaintiff's condition were insufficient to state a hostile work environment claim); *Flowers v. S. Reg'l Physician Servs., Inc.*, 247 F.3d 229, 236 (5th Cir. 2001) ("[D]isability-based harassment must 'be sufficiently pervasive or severe to alter the conditions of employment and create an abusive working environment.'") (quoting *McConathy*, 131 F.3d at 563).

Accordingly, I find that the conduct alleged by Willard was not sufficiently severe or pervasive to affect a term or condition of her employment. Her hostile work environment claim is, therefore, insufficient to withstand summary judgment.

**B.  ADA DISCRIMINATION**

"To establish a prima facie discrimination claim under the ADA, a plaintiff must provide: (1) that [s]he has a disability; (2) that [s]he was qualified for the job; and (3) that [s]he was subject to an adverse employment decision on account of [her] disability." *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 697 (5th Cir. 2014) (quotation marks, brackets, and citation omitted). In seeking summary judgment, FISD argues that Willard's discrimination claim fails on the third prong because she voluntarily resigned from her employment and, thus, cannot establish that FISD took an adverse employment action against her.

"Adverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating." *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 824 (5th Cir. 2019) (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007)). Although Willard voluntarily resigned, "a resignation may still constitute an adverse employment action 'if the resignation qualifies as a constructive discharge.'" *Brown v. Liberty Mut. Grp., Inc.*, 616 F. App'x 654, 657 (5th Cir. 2001) (quoting *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566 (5th Cir. 2001)). A constructive discharge occurs when "an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 136 S.Ct. 1769, 1776 (2016) (internal quotation marks and citation omitted). *See also Stringer v. N. Bolivar Consol. Sch. Dist.*, 727 F. App'x 793, 802 (5th Cir. 2018) (explaining that an employee's resignation is a constructive discharge when the "employer deliberately makes an employee's working conditions so intolerable" that the employee resigns involuntarily) (quoting *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 342 (5th Cir. 2005)); *Young v. Sw. Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975) ("The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee."). "Whether an employee would feel forced to resign is case—and fact—specific." *Keelan*, 407 F.3d at 342.

In this case, Willard presents no evidence indicating she felt compelled to resign. To the contrary, Willard expressly admits that she did not view the working environment at Westwood Elementary School to be intolerable.

> Q. Do you think that your working conditions were intolerable?
>
> A. Can you explain that?
>
> Q. Yeah. Do you think that your working conditions were so bad that you had to quit?
>
> A. No.

Dkt. 29-1 at 26. This admission is a showstopper.[2] It puts Willard in an untenable position. She is forced to argue that even though she did not feel compelled to resign under her working conditions, she should still be able to proceed to trial on a constructive discharge theory because a reasonable person in her shoes would have felt compelled to resign. This argument has no teeth. It presupposes that Willard is not a reasonable person, an admittedly unusual position for Willard's counsel to pursue. But even a deeper dive fails to uncover evidence that Willard's working conditions were so egregious that a reasonable person would have felt no choice but to submit her resignation.

To determine whether a reasonable person would feel compelled to resign, the Fifth Circuit has instructed district courts to consider six factors:

---

[2] Willard has submitted a declaration directly contradicting her deposition testimony. The declaration states, in part, that she felt "compelled . . . to resign" and was given "no other reasonable choice but to be constructively terminated." Dkt. 32-2 at 3. This portion of the declaration is disregarded under the so-called "sham affidavit rule." *See S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) ("It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony.").

> (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer[s] were accepted or not.

*Aryain v. Wal-Mart Stores Tex., LP.*, 534 F.3d 473, 481 (5th Cir. 2008). Willard fails to present summary judgment evidence on any of these six points. Because Willard served as a classroom teacher during the 2015–2016 school year and was expected to continue working as a classroom teacher in 2016–2017, there was never a demotion, reduction of job responsibilities, or reassignment to menial or degrading work. It is true that Willard was being moved from teaching a first-grade class to a Pre-K class, but there is no assertion, much less summary judgment evidence, that the new position constituted a reduction in job responsibilities or menial or degrading work. "[C]onstructive discharge cannot be based upon an employee's subjective preference for one position over another, nor will a mere change of position or job responsibilities, without more, amount to constructive discharge." *McMillan v. Corridan*, No. 97-3981, 1999 WL 729250, at *5 (E.D. La. Sept. 15, 1999). The first, third, and fourth elements, thus, fall by the wayside. There is also no claim that Willard faced a reduction in salary or encountered an offer of early retirement, eliminating any possible reliance on the second or sixth factors.

That leaves the fifth factor. Willard must show that FISD badgered, harassed, and humiliated her in a calculated manner to encourage her resignation. Willard complains about the following conduct:

> [FISD's] actions in telling me and others that I would be demoted [to a paraprofessional position], giving me 24 hours to resign my teaching contract, publicly telling me and others, that I would be recommended to be

11

> terminated, demeaning me, perceiving me as disabled in a public manner, saying I was not well enough to handle a classroom, pressuring me, intimidating me, putting me under duress, belittling my work performance with no support or complaints, informing me that if I did not sign a contract by May 24, 2016 I would be considered to have resigned.

Dkt. 32-2 at 3. These facts, without more, are insufficient for a finding that a reasonable employee in Willard's position would have felt compelled to resign. There is no doubt that Willard was highly dissatisfied, dismayed, and disillusioned with how FISD handled her employment situation in the months after her son's tragic suicide. She also clearly disagreed with any assertion that she had received "too much assistance from other teachers and that parents were concerned." *Id.* at 2. But the test is not whether Willard was insulted or offended by her employer's actions. *See Douglass v. USAA*, 79 F.3d 1415, 1430 (5th Cir. 1996) ("It is more than well-settled that an employee's subjective belief that [s]he suffered an adverse employment action as a result of discrimination, without more, is not enough."). The ultimate legal question is whether FISD created an intolerable working condition by which a reasonable employee would have felt compelled to resign. *See Green*, 136 S.Ct. at 1776. Based on the summary judgment record before me, I do not find that a reasonable person would have felt compelled to resign. *See Stevenson v. Fort Bend Cty.*, No. H-05-2656, 2006 WL 3245755, at *7 (S.D. Tex. Nov. 7, 2006) ("Plaintiff's allegations that everyone in the department was upset with her, was unkind to her, and ignored her, to the extent these allegations are supported by the evidence at all, do not rise to the level of intolerable conditions that would force a reasonable person to resign.").

Sure, a reasonable person might have been upset, like Willard was, that FISD offered her a paraprofessional contract, retracted that offer, and then, ultimately, renewed

her teaching contract. A reasonable person might also have been agitated to learn that superiors were recommending her termination. That is completely understandable. Being upset at your employer, however, does not automatically mean that the working conditions in which you operated were so intolerable that you had to resign. The law is clear that notifying Willard of the recommendation to terminate her teaching contract in accordance with state law is not an intolerable condition. *See Mitchell v. City of Natchez*, No. 5:11-CV-137 DCB RHW, 2013 WL 139337, at *6 (S.D. Miss. Jan. 10, 2013) ("Chief Mullins did not create intolerable working conditions by notifying Mitchell of his intention to recommend his termination[.] . . . [T]he prospect of undergoing the City's termination procedures was not an intolerable condition of employment."). Telling Willard that she had to resign from her teaching contract to take a paraprofessional job also does not rise to the level of an intolerable condition.

Finally, it is well-settled that the required showing for constructive discharge is more stringent than the showing for a hostile work environment claim. *See Kinney Shoe*, 237 F.3d at 566 ("Constructive discharge requires a greater degree of harassment than that required by a hostile environment claim."). Since I have already held that Willard has failed to establish a hostile work environment claim, her constructive discharge claim fails as a matter of law. *See Aryain*, 534 F.3d at 480.

## CONCLUSION

For the reasons stated above, I **RECOMMEND** that the Motion for Summary Judgment (Dkt. 29) be **GRANTED**.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED at Galveston, Texas, this 12th day of December, 2019.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE